IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION FILE NO. |
| v. | 1:16-CR-145-TWT-JKL-5 |
| DONALD GLASS (5) | |

## **ORDER AND NON-FINAL REPORT AND RECOMMENDATION**

This Order and Report and Recommendation addresses the following pending motions filed by Defendant Donald Glass:

– Defendant's Motion to Compel Discovery [Doc. 739]

– Defendant's Motion to Suppress [Doc. 985], which pertains to evidence seized from the search of an apartment located at 4015 Covington Highway, Apartment C-2, Decatur, Georgia

– Defendant's Preliminary Motion to Suppress Evidence Seized from 1991 Chevrolet Caprice [Doc. 986]

– Defendant's Motion for Full Identification of Government Undercover Agents/Informants [Doc. 987]

– Defendant's Supplemental Motion to Suppress Evidence Seized from 1991 Chevrolet Caprice [Doc. 1151]

– Defendant's Preliminary Motion to Suppress Out of Court Identification and Evidence of a Suggestive Photo Array [Doc. 1180]

## I.    SUMMARY OF INDICTMENT

Glass is charged in this case with RICO conspiracy (Count One); murder (Count Eight); using and carrying a firearm during a crime of violence (Count Nine); possession with intent to distribute marijuana and methamphetamine (Count Ten); and possession of a firearm in furtherance of a drug trafficking crime (Count Eleven).  [*See* Doc. 1.]  The government alleges that Glass was a member of the Gangster Disciples, which operated as a racketeering enterprise as defined by 18 U.S.C. § 1961(4).

According to the indictment, members of the Gangster Disciples are organized in geographic groups, each called a "count" or a "deck."  [Doc. 1 at 2.] The indictment further alleges that each state has a "Chief Enforcer"—*i.e.*, someone who is responsible for enforcing the organization's codes, rules, and regulations.  [*Id.* at 4.]  The State Chief Enforcer is responsible for seeing that punishment is effectuated for Gangster Disciples members who violate gang rules and for ensuring that people who claim to be members of the Gangster Disciples

2

are in fact members in good standing—*i.e.*, that they are "plugged in."  [*Id.* at 2, 4.]

Each count also has a Chief Enforcer who is responsible for enforcing gang rules

within that count.  [*Id.* at 4.]  Chief Enforcers command "enforcement teams" and

"clean-up crews," which are groups Gangster Disciples members tasked with

administering discipline, including assaults and killings.  [*Id.*]  The HATE

Committee is allegedly a specially-named enforcement team.  [*Id.* at 5.]  According

to the indictment, Glass, co-defendant Kevin Clayton, co-defendant Lewis Mobely,

and others founded the HATE Committee, and co-defendant Alonzo Walton, who

was acting as "governor of Georgia," approved the HATE Committee's existence

and role.  [*Id.* at 18.]  During the time period relevant to this case, Glass allegedly

held the rank of "First Coordinator of the Eastside Count."  [*Id.* at 12.]

The government alleges that Glass was involved in or participated in

numerous overt acts in furtherance of the RICO conspiracy charged in Count One.

Allegedly, in November 2012, Glass, Walton, and co-defendant Shauntay Craig

were involved in an extortion scheme of a rap artist.  [Doc. 1 at 19-20 (Overt Act

12.)]  On February 16, 2013, Glass, Clayton, Craig, and Mobely were allegedly

filming a music video featuring the Gangster Disciples outside a convenience store

when Jermaine Higgins stepped in front of the camera and taunted them.  [*Id.* at 20

3

(Overt Act 15.)]  In retaliation, Mobely allegedly shot Higgins.  [*Id.* (Overt Act 16).]

On July 1, 2015, Glass allegedly "chided" Q.H., a Gangster Disciples and HATE Committee member, for not reacting more strongly when Q.H. and a rival Bloods gang member got into a fight.  [Doc. 1 at 34 (Overt Act 94).]  Allegedly, Glass "urged Q.H. to remedy his poor prior performance by finding and shooting a rival Bloods gang member."  [*Id.*]  The government alleges that co-defendant Perry Green handed a firearm to Q.H. to shoot DeMarco Franklin, whom Green and Q.H. allegedly believed was a rival Bloods gang member.  [*Id.* (Overt Act 95).]  Q.H. then shot and killed Franklin, allegedly upon the urging of Glass and in the belief that Franklin was a rival Bloods gang member."  [*Id.* (Overt Act 96).]

According to the indictment, on July 3, 2015, Glass, along with alleged Gangster Disciples and HATE Committee members J.B., D.L.P., K.F., R.G., A.C., and others, planned to rob a drug dealer who sold drugs from a motel room in Stone Mountain, Georgia.  [Doc. 1 at 34-35 (Overt Act 97).]  Allegedly, the robbery was delayed due to police activity in the area, but later that day, J.B., D.L.P., K.F., and R.G. returned to the motel to commit the robbery, and shot and killed Edward Chadmon and shot and injured I.M.  [*Id.* at 35 (Overt Act 98).]  During the alleged attempted robbery, the robbery victims shot R.G. in the head.  [*Id.* (Overt Act 99).]

Afterwards, Gangster Disciples member S.L. allegedly held a meeting at which Glass and S.L. ordered that funds collected from other Gangster Disciples members be used to obtain additional firearms and that Gangster Disciples members to retaliate for the shooting of R.G.  [*Id.* (Overt Act 99).]  Allegedly, Glass and other Gangster Disciples members then obtained additional firearms, extended magazines, ammunition, and bulletproof vests, some of which were stored at Glass's residence.  [*Id.* (Overt Act 100).]  Following the shooting of R.G., Glass allegedly also "put Gangster Disciples members in the Central Avenue area of Stone Mountain 'on hold' because they were not sufficiently 'plugged in.'"  [*Id.* at 35-36 (Overt Act 101).]

On or about July 29, 2015, Glass allegedly commended another Gangster Disciples member, Joseph Broxton, and others for stealing a BMW.  [Doc. 1 at 36 (Overt Act 104).]  The next day, July 30, 2015, Glass allegedly provided firearms to Q.H. and others and instructed them to attack Gangster Disciples members in the Central Avenue area of Stone Mountain, Georgia, whom he believed were not following rules.  [*Id.* (Overt Act 105).]  Q.H., J.B., D.L.P., and K.F. then allegedly shot and injured F.C. at F.C.'s Central Avenue residence.  [*Id.* (Overt Act 106).]  In a separate incident Q.H., J.B., D.L.P., and K.F. allegedly shot and killed Rocqwell

Nelson and shot and injured J.T. at a Central Avenue residence.  [*Id.* (Overt Act 107).]

On August 3, 2015, Glass and another Gangster Disciples member, known as "Gator," allegedly shot and killed Gangster Disciples member Robert Dixon because Glass suspected that Dixon was cooperating with police and because Dixon was not sufficiently "plugged in."  [Doc. 1 at 37 (Overt Act 108); *see also id.* at 46.]  The government alleges that Glass used and carried a firearm in connection with the alleged murder.  [*Id.* at 47.]

The government additionally alleges that on or about August 19, 2015, Glass possessed in his residence rubber gloves, a mask, a folding knife, one AKM assault rifle with a "banana clip" magazine with 23 rounds of ammunition, one WASR-10 assault rifle with a "banana clip" magazine with 31 rounds of ammunition, three loaded handguns, an extended magazine for 9mm ammunition, and approximately 195 rounds of live ammunition.  [*Id.* at 38 (Overt Act 113).]  Also on August 19, 2015, it is alleged that Glass possessed with intent to distribute marijuana and methamphetamine.  [*Id.* at 47.]

On or about August 21, 2015, Clayton allegedly complained that Glass should have been using HATE Committee members for "robbing dope boys" and "hitting major licks."  [Doc. 1 at 38 (Overt Act 114).]  In September 2015, Clayton

6

allegedly told co-defendant Vancito Gumbs that Glass was Clayton's "right hand guy" and that the HATE Committee was the "clean-up crew" within the Gangster Disciples's "structure."  [*Id.* at 39 (Overt Act 120).]

Additional allegations and facts are discussed in context below as necessary.

## II.   MOTION TO COMPEL DISCOVERY [739]

Glass has filed a lengthy motion to compel discovery in this case.  [Doc. 739.[1]]  The gist of the motion is that discovery in this case is so voluminous that Glass and his counsel are unable to evaluate properly the evidence that the government has against Glass.  [*Id.* at 2.]  Glass asks that the Court order the government to (1) identify from the evidence produced in this case the specific items that it intends to use in its case-in-chief; (2) identify specifically "any and all exculpatory and[/]or impeaching discovery materials"; (3) produce and identify the statements made by co-defendants that the government intends to produce at trial so that counsel can evaluate the statement for possible problems under *Bruton v. United States*, 391 U.S. 123 (1968); (4) produce and identify any co-conspirator statements that the government will seek to introduce under Federal Rule of

---

[1] Glass's motion does not include page numbers; citations to specific pages are to the page numbers automatically generated by CM/ECF.

Evidence 801(d)(2)(E); and (5) organize and label the discovery related to Glass.[2] [*Id.* at 4-23.]  Glass also enumerates, in connection with the first two foregoing categories of information, at least 35 requests for documents and other information. [*Id.* at 8-16, 18-19.[3]]

The government opposes the motion.  [*See* Doc. 1016.]  In response to Glass's request for the identification of evidence to be introduced in the government's case-in-chief, the government contends that the cases that Glass cites pre-date computerized discovery, and are largely distinguishable on that basis.  [*Id.* at 4-5.]  Likewise, the government maintains, this is not a case that involves a narrow cache of inculpatory documents; rather, because Glass is charged with RICO conspiracy, a vast swath of documents relating to the alleged enterprise and its members' activities are relevant.  [*Id.* at 6.]  In the government's view, Glass's request would have the government inappropriately disclose its trial strategy, which the government contends is particularly "untenable" because much of the government's evidence at trial will consist of testimony that "rests in the form of

---

[2] Glass states in a footnote that this final request is being made as an alternative to his joining in defendants' request for appointment of a coordinating discovery attorney.  [Doc. 739 at 22 n.3.]  The Court appointed a coordinating discovery attorney [*see* Doc. 768]; therefore, this final request is moot.

[3] One request was incomplete.  [*See* Doc. 739 at 16.]

302s and witness statements" that are in the form of *Jencks* Act materials. [*Id.* at 7.] Finally, the government points out that it has provided indices of documents to defendants and text-searchable line sheets, and that the Court has approved a coordinating discovery attorney. [*Id.*]

In response to Glass's request for documents and statements that are exculpatory in nature, the government states that it will provide such information as it is already required to do. [Doc. 1016 at 7-8.] The government objects, however, to being forced to identify specifically what evidence is exculpatory is problematic because the government does not know Glass's theory of the case and cannot know for certainty which documents would exculpate him, much less be helpful to his defense. [*Id.* at 8.] As for the request to identify statements that might create a *Bruton* problem, the government responds that *Bruton* is implicated when a non-testifying defendant's confession implicates a co-defendant, and as of the date of its response, it was not aware of material that would trigger a *Bruton* problem. [*Id.* at 9.] The government further represents that if it becomes aware of a *Bruton* issue, "it will seek Court approval for any redaction or other measure to alleviate the concern." [*Id.*] As for the request to identify co-conspirator statements, the government states that those statements "will be easily identifiable as *Jencks* material, which will be provided to defense [counsel] sufficiently before

trial to allow him to prepare any cross-examination." [*Id.* at 9.] Finally, the government responds to each of Glass's 35 separate requests for production. [*Id.* at 11-16.]

After careful consideration, the Court finds that at this point, Glass's motion should be denied. As an initial matter, the Court is aware of and appreciates the volume of information in this case. Indeed, that is why the Court approved the request for a coordinating discovery attorney to assist counsel with reviewing and analyzing the information in this case. But the government's arguments in opposition to the motion are well-taken, and at this point, the Court will not order the government to identify the evidence that it intends to use in its case-in-chief, to specifically identity potential *Brady* material in the production, to identify statements that could conceivable pose a potential *Bruton* problem, or to identify the statements of co-conspirators that the government might introduce against him. Much of the information that Glass seeks are covered by this Court's scheduling order [*see* Doc. 272], has been produced by the government, or will be produced by the government. Other requests are inappropriate, as they seek information that the Court simply cannot order, such as the early production of *Jencks*,[4] or are the

---

[4] *See United States v. Jordan,* 316 F.3d 1215, 1227 n.17, 1251 & n.78 (11th Cir. 2003); *United States v. Jones,* No. 1:05-CR-617-WSD, 2007 WL 2071267, at

subject of a separate motion, such as the request for identification of confidential informants, which is discussed below.   [*See* Doc. 739 at 10-11.]   Accordingly, Glass's Motion to Compel Discovery [Doc. 739] is **DENIED**.

### III.   MOTION   TO   SUPPRESS   EVIDENCE   SEIZED   GLASS'S   APARTMENT [985][5]

On August 3, 2015, DeKalb County police officers responded to a shooting and discovered that Robert Dixon had been shot multiple times.   On August 12, 2015, detectives interviewed an individual (the "Informant"), who identified Glass as having been involved in the shooting.

On August 18, 2015, DeKalb County Police Department Detective B.P. Kershaw presented an affidavit in support of an application for a search warrant to a DeKalb County Magistrate, requesting a search of Glass's residence for firearms, ammunition, and other items used in connection with the murder and evidence of street gang membership or affiliation.   [*See* Doc. 1253 at 4-6.[6]]   The affidavit stated:

---

*14 (N.D. Ga. July 19, 2007) ("The *Jencks* Act materials . . . are not subject to disclosure until the government witness testifies at trial on direct examination, or earlier if the government agrees."), *adopted at* *1 n.2, 3-4.

[5] The Court ordered Glass to supplement his motion by October 17, 2017. He failed to do so.   The Court therefore considers the motion to suppress as presented to the Court.

[6] A copy of the search warrant, the application, an inventory of what was seized, and crime scene investigation reports are docketed at Doc. 1253.

11

On 8/3/15 at 0133 hours officers responded to 2202 Fairington Village Drive in reference to a person shot. The victim, Robert "Rampage" Dixon was shot multiple times including two gunshot wounds to the head. Six 9mm shell casings were found at the scene.

On 8/12/15 DA Investigator Pinckney, Gang Detective Hardaway and I interviewed [REDACTED] in reference to [REDACTED] knowledge of multiple homicides over the past few months. [REDACTED] said that "Smurf" (who is a member of the Hate Committee) told [REDACTED] directly that he and "Gator" shot and killed "Rampage" because "Rampage" was talking to the police about [REDACTED] said that "Smurf" told [REDACTED] that he used a .357 revolver and that "Gator" had a Glock 9mm. [REDACTED] said that most of the weapons used for the murders committed by the Hate Committee gang members were stored at Smurf's apartment on Covington Hwy near Mama's Primetime. [REDACTED] said that the apartment is the second or third building on the right side of the entrance and that the door faces Covington Hwy. [REDACTED] confirmed the identity of Donald "Smurf" Glass (2/26/90).

Detective Cribbs was able to determine that Donald Glass has utility bills for 4015 Covington Hwy apartment C-2 in Decatur, which is directly across the street from Mama's Primetime. Upon detectives responding to the location, apartment C-2 was positioned exactly as described [REDACTED].

[Doc. 1253 at 5.]

---

References to page numbers are to the page numbers automatically generated by CM/ECF.

The DeKalb County Magistrate issued the search warrant, and on August 18 or 19, 2015, officers executed the warrant.  Defendant was arrested sometime thereafter.

Glass moves to suppress the search of the residence on the grounds that (1) the "application was based solely on the presumptively unreliable statement of an accomplice and/or co-defendant" and (2) the application was based on stale information.  [Doc. 985 at 4-10.]  Glass additionally argues that the good faith exception in *United States v. Leon,* 468 U.S. 897 (1984), is inapplicable because the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" in that the application was based on the statement of an "accomplice/co-defendant."  [*Id.* at 10.]  Finally, Glass argues that officers executing the warrant could not have reasonably relied on the warrant because "a reasonably well-trained officer would have known that the warrant was illegal."  [*Id.* at 11.]

Turning first to the issue concerning the veracity of the Informant, I note that this is the second time that Glass has challenged the sufficiency of the Informant's testimony.  In 2015, a federal grand jury sitting the Northern District of Georgia charged Glass in a three-count indictment with possession of firearms while being a convicted felon, possession with intent to distribute marijuana, and possession of

13

a firearm in furtherance of a drug trafficking crime. [*United States v. Glass*, No. 1:15-cr-365-MHC-JKL ("*Glass I*") Doc. 1.[7]] In *Glass I*, Glass moved to suppress the fruits of the search on the grounds that there was no evidence concerning the reliability of the Informant. [*Glass I* Doc. 12 at 3; *Glass I* Doc. 20 at 3.] I rejected that argument and found that the informant's information had been sufficiently corroborated. [*Glass I* Doc. 29 at 4-8.] The Honorable Mark H. Cohen, the district judge presiding in *Glass I*, adopted my recommendation that the motion to suppression be denied, stating:

> This Court agrees with the Magistrate Judge's finding that the informant's information as to the location of [Glass's] apartment and type of weapon used to murder the victim was sufficiently corroborated. This included the facts that the informant knew information about the crime scene that was not made public, the informant identified the type of weapon used in the murder, the informant describe the details of the location of [Glass's] apartment, and law enforcement officers were able to confirm the location of that apartment through utility bills as well as personal observation. The informant was also interviewed personally, which can enhance credibility.

*United States v. Glass*, No. 1:15-cr-365-MHC, 2016 WL 1216094, at *3 (N.D. Ga. Mar. 25, 2016).

---

[7] *Glass I* was dismissed after Glass was indicted in this case.

14

In the case at bar, Glass advances a slightly different argument, this time alleging that the information that the Informant provided is *per se* unreliable because her or she was an accomplice—and possibly a co-defendant—in the alleged murder.  [Doc. 985 at 5-8.]  Glass maintains that "[t]here is nothing in the search warrant application to overcome the presumption that the statement was unreliable.  Without this basic information, there is no way or basis to evaluate the information."  [*Id.* at 8.]

This argument is not persuasive.  For starters, the basis for Glass's contention that the Informant was an accomplice in the murder is not clear.  Detective Kershaw's affidavit does not indicate the Informant said that he was involved in the murder of Dixon, and Glass points to no other evidence in the record to support his contention.  Thus, the premise of Glass's argument is unsupported.

But presuming that the Informant was an accomplice in Dixon's murder, the Court readily concludes that the Informant's information was sufficiently corroborated.  A judicial officer considering an application for a search warrant must make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place.  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  "A search warrant is supported by probable cause

15

if the supporting affidavit establishes 'a connection between the defendant and the location to be searched; . . . a link between the location and criminal activity; and . . . the informant's veracity and basis of knowledge.'" *United States v. Joseph*, 709 F.3d 1082, 1099 (11th Cir. 2013) (alterations in original) (quoting *United States v. Davis*, 313 F.3d 1300, 1303 (11th Cir. 2002)).  When an affidavit is based in substantial part on information provided by an informant, the informant's reliability, veracity, and basis of knowledge are relevant considerations—but not independent, essential elements—in finding probable cause.  *Gates*, 462 U.S. at 230.

A court examining a challenge to a search warrant accords "great deference" to the judicial officer's finding of probable cause.  *Joseph*, 709 F.3d at 1093.  The reviewing court must ask whether the judicial officer had a substantial basis for concluding that probable cause existed.  *Id.*; *see also Massachusetts v. Upton*, 466 U.S. 727, 728 (1984) (per curiam) ("[T]he task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant."); *United States v. Miller*, 24 F.3d 1357, 1363 (11th Cir. 1994) ("[R]eviewing courts lend substantial deference to an issuing magistrate's probable cause determinations.").  When a search is conducted pursuant to a warrant, the

16

defendant bears the burden to show that the warrant is invalid. *United States v. Lockett*, 533 F. App'x 957, 965 (11th Cir. 2013); *United States v. Hinton*, 113 F. Supp. 3d 1277, 1292 (N.D. Ga. 2015), *report and recommendation adopted at* 1279, *aff'd*, 676 F. App'x 842 (11th Cir. 2017).

As noted in *Glass I*, Detective Kershaw did not blindly accept the word of the Informant to secure the warrant to search the residence. Rather, law enforcement corroborated information that the Informant provided, including the location of Glass's residence and the type of weapon used in the murder. The Informant also knew details of the incident that were not publicly available. In addition, officers met with the Informant face-to-face. *See United States v. Brown*, 636 F. App'x 514, 518 (11th Cir. 2016) (recognizing that a face-to-face meeting with an informant "would make the informant even more reliable") (citing *United States v. Heard*, 367 F.3d 1275, 1279 (11th Cir. 2004)).[8]

---

[8] The cases that Glass cites for the proposition that the confession of an accomplice is inherently untrustworthy are inapposite. *See Lee v. Illinois*, 476 U.S. 530 (1986); *United States v. Costa*, 31 F.3d 1073 (11th Cir. 1994); *United States v. Deeb*, 13 F.3d 1532 (11th Cir. 1994). Those cases do not hold that information supplied to law enforcement by an accomplice is *per se* unreliable when used to establish probable cause for issuance of a warrant, especially when the information is independently corroborated.

17

Glass's argument that the information that the Informant provided was stale is also without merit.  Police interviewed the Informant on August 15, 2015, 12 days after Dixon's alleged murder.  Glass argues that the Informant's statement that weapons were stored at the apartment was stale at that point because the Informant did not also say that the weapons were returned to the apartment following the murder.  [Doc. 985 at 9.]

"[T]he information supporting the government's application for a warrant must show that probable cause exists at the time the warrant issues."  *United States v. Bervaldi*, 226 F.3d 1256, 1264 (11th Cir. 2000).  "[T]here is no mathematical measure for when freshness fades away and staleness sets in."  *United States v. Lopez*, 649 F.3d 1222, 1246 (11th Cir. 2011).  Rather, whether information is stale depends on the unique facts of the case.  The Eleventh Circuit has explained:

> When reviewing staleness challenges we do not apply some talismanic rule which establishes arbitrary time limitations for presenting information to a magistrate, rather, we review each case based on the unique facts presented.  In this case-by-case determination we may consider the maturity of the information, nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched.

*United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994) (quotations and citations omitted).

18

Under the circumstances of this case, a 12-day gap between the alleged murder and the police's interview of the Informant did not render information concerning the location of the firearm stale because the information related to items stored in Glass's apartment. *See United States v. Haymon*, 669 F. App'x 546 (11th Cir. 2016) (affiant's 12-day-old statement that firearm was stored in defendant's home was not stale because the information pertained to an object stored in defendant's house). Further, officers verified that the apartment was Glass's apartment, and it was reasonable to believe that Glass continued to reside there. *See Bervaldi*, 226 F.3d at 1266 (finding that it was reasonable for officers to believe that defendant's residency extended for at least 6 months and 21 days). According to the affidavit, the Informant also reported that Glass was a member of the HATE Committee, and that weapons used by the HATE Committee were "stored" at the apartment, which implies that the weapons used in Dixon's murder would, in fact, be returned there as part of ongoing criminal activity. At bottom, the information in the affidavit was not stale as it suggested that weapons used in Dixon's murder were presently located there.

Finally, Glass's argument that the *Leon* good faith exception does not apply is unpersuasive for the same reasons as set forth in Judge Cohen's order adopting my Report and Recommendation in *Glass I*. In *Leon*, the Supreme Court

19

recognized the good faith exception to the exclusionary rule for searches that are conducted pursuant to warrants.  Observing that the purpose of the exclusionary rule is to deter unlawful police conduct, the Supreme Court found that this purpose would not be served, and the rule should not be applied, when an officer, acting with objective good faith, has obtained a search warrant from a judge and acted within its scope.  *See Leon*, 468 U.S. at 920-21.  Nonetheless, the *Leon* Court specified four situations in which suppression would still be appropriate: (1) when the judicial officer issues the warrant on a deliberately or recklessly false affidavit; (2) when the judicial officer wholly abandons his judicial role; (3) when the warrant is issued on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) when the warrant is so facially deficient that an officer could not reasonably presume it to be valid.  *Id.* at 923.

Glass argues that the *Leon* good faith exception is inapplicable under the third of these exceptions—*i.e.*, that the Detective Kershaw's affidavit was so lacking in indicia of probable cause as to render official belief that probable cause existed entirely unreasonable.  [Doc. 985 at 10.]  Glass further contends any well-trained officer would know that the warrant was illegal.  [*Id.* at 11.]  The Court disagrees.

20

As Judge Cohen explained in *Glass I*, Detective Kershaw's affidavit set forth sufficient indicia of probable cause such that reliance on the warrant would not have been unreasonable.  Specifically, the affidavit "states on its face that the informant, who was interviewed in person, identified the type of weapons used in the murder, described the details of the location of Defendant's apartment, and indicated that the weapons were stored in the apartment; moreover, law enforcement officers were able to corroborate the location and tenant of that apartment."  *Glass I*, 2016 WL 1216094, at *4.  Further, the warrant affidavit established a nexus between Glass, the apartment to be searched, and the criminal activity, and it "contained sufficient information to establish a likelihood that evidence sought would be found in the place to be searched."  *Id.*  Thus, even if the warrant were found to be deficient, law enforcement reasonably relied in good faith on the warrant.  Accordingly, Glass's motion to suppress is due to be denied under the *Leon* good faith exception to the exclusionary rule.

For the foregoing reasons, it is **RECOMMENDED** that Glass's Motion to Suppress [Doc. 985] be **DENIED**.

## IV.   MOTIONS TO SUPPRESS EVIDENCE SEIZED FROM 1991 CHEVROLET CAPRICE [986 & 1151]

Glass has moved to withdraw his preliminary motion to suppress evidence seized from a 1991 Chevrolet Caprice in light of the government's representation that it would not use any evidence obtained as result of the search of that vehicle. [Doc. 1151 at 1.]  Glass requests that the Court either grant the motion to suppress as consented to by the parties, or alternatively, grant him leave to withdraw the motion.  [*Id.*]  Given that the government promised not to use evidenced seized from the Caprice, Glass's motion is now moot.  Rather than issue a ruling on the merits of the motion to suppress, the Court **DEEMS WITHDRAWN** Glass's Preliminary Motion to Suppress Evidence Seized from 1991 Chevrolet Caprice [Doc. 986] and Supplemental Motion to Suppress Evidence Seized from 1991 Chevrolet Caprice [Doc. 1151].

## V.   MOTION FOR FULL IDENTIFICATION OF GOVERNMENT UNDERCOVER AGENTS/INFORMANTS [987]

In his Motion for Full Identification of Government Undercover Agents/Informants, Glass requests that the Court order the government to "identify

and disclose information regarding persons assisting the government as informants and as active participants in investigation efforts." [Doc. 987 at 6.[9]]

It is well-established that the government has a limited privilege to withhold the identity of law enforcement informants. *Roviaro v. United States*, 353 U.S. 53, 59 (1957). The purpose of this privilege "is the furtherance and protection of the public interest in effective law enforcement." *Id.* But where the disclosure of an informant's identity or the contents of his communication is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the trial court may require disclosure. *Id.* at 60-61. In balancing these interests, the Court must take into account "the particular circumstances of each case, the crime charged, possible defenses, and the potential significance of the informant's testimony." *United States v. Gutierrez*, 931 F.2d 1482, 1490 (11th Cir. 1991). Courts in this Circuit consider the following three factors in evaluating whether the government should be required to reveal the identity of informants: "(1) the extent of the CI's participation in the criminal activity; (2) the directness of the relationship between the defendant's asserted defense and the probable testimony

_____

[9] Glass's motion does not include page numbers; citations to specific pages are to the page numbers automatically generated by CM/ECF.

of the CI; and (3) the government's interest in nondisclosure." *United States v. Razz*, 240 F. App'x 844, 847 (11th Cir. 2007) (citing *Gutierrez*, 931 F.2d at 1490).

The concerns in *Roviaro* are generally inapplicable where the government intends to call the informant as a witness at trial. *See Banks v. Dretke*, 540 U.S. 668, 697 (2004) ("The issue of evidentiary law in *Roviaro* was whether (or when) the Government is obliged to reveal the identity of an undercover informer the Government does *not* call as a trial witness."); *United States v. Rook*, No. 1:15-CR-380-SCJ, 2016 WL 2344877, at *3 (N.D. Ga. May 3, 2016); *United States v. Pineda*, No. 1:11-CR-00006-CAP-JFK, 2012 WL 2906758, at *44 (N.D. Ga. June 4, 2012), *report and recommendation adopted*, 2012 WL 2907447 (N.D. Ga. July 16, 2012). Here, the government has indicated that it intends to call its confidential informants as witnesses during the trial and will disclose prior to trial the identity of the informant and any related *Jencks* Act, *Brady*, and *Giglio* materials. [Doc. 997 at 6-7.] In light of this representation, the Court will not require the government to disclose the identity of such confidential informant at this time.

The Court additionally concludes that Glass has not met the second *Roviaro* factor—*i.e.*, a direct relationship between his defense and the probable testimony of the informant. The burden is on the defendant to show that the informant's testimony would significantly aid in establishing an asserted defense. *United States*

24

*v. Johnson*, 702 F. App'x 815, 816 (11th Cir. 2017) (citing *Gutierrez*, 931 F.2d at 1491).  "Mere conjecture about the possible relevance of the testimony is insufficient to compel disclosure."  *Id*.

Glass generally argues that confidential informants must have provided information to the government about the Gangster Disciples organization; thus, the informants' identity and knowledge are "integral to the government's case" and essential for Glass to develop an adequate defense.  [Doc. 987 at 4-5.]  Glass further asserts that the informants were not merely individuals with knowledge of the organization, but instead were persons actually involved in criminal activity that the government ascribes to the organization.  [*Id.* at 5.]  He maintains:  "If informants orchestrated criminal activity in order to characterize it as being activity to advance the criminal enterprise . . . their informant status is obviously crucial to the defense."  [*Id.* at 6.]  This is insufficient.  Glass has not indicated what information he believes that he would obtain from the confidential informant or why it would materially support his defense.  In fact, Glass does not specify what defense that might be.

For the foregoing reasons, *Roviaro* does not require disclosure of the confidential informant's identity at this time.  Glass's Motion for Full Identification of Government Undercover Agents/Informants [Doc. 987] is therefore **DENIED**.

25

## VI.   PRELIMINARY MOTION TO SUPPRESS OUT OF COURT IDENTIFICATION AND EVIDENCE OF A SUGGESTIVE PHOTO ARRAY [Doc. 1180]

Glass moves to suppress any testimony related to an out-of-court identification of Glass by a witness, M.G.  [Doc. 1180.]  According to the parties' briefs, after Dixon's murder M.G. reported to police that she had seen a man running from the scene of the murder and that she believed that she had later recognized the same man on the television news story that portrayed "members of a gang" that had recently been arrested near where she lived.  [Doc. 1180 at 2; Doc. 1204 at 2.]  Police showed her a photo array, and she selected Glass as the person she had seen running from the scene.

The government stated during a pretrial conference that it would not call M.G. to make an in-court identification of Glass; however, the government stated that they did intend to have a police officer testify about the conduct of the photo array and M.G.'s identification of Glass from the array.  Glass argues that the government should be prohibited from introducing any evidence of the photo array, including M.G.'s identification of Glass.  [Doc. 1180 at 2.]

Glass concedes that at this time his investigation regarding the circumstances of the identification is incomplete; however, he requests an evidentiary hearing "to determine whether defendant is entitled to have the expected in-court identification

26

suppressed." [Doc. 1180 at 4-5.] In support of his motion, Glass attaches an affidavit from Heather M. Kleider-Offutt, Ph.D., a purported expert in the area of eyewitness identification, who concludes that because M.G. saw a photograph of Glass before being shown the photo array, an in-court identification would be tainted and unreliable. [*Id.* at 4; Doc. 1180-4.]

The government responds that Glass's motion and request for an evidentiary hearing should be denied because Glass has not developed sufficient facts to warrant suppression. [Doc. 1204 at 3.] As for Dr. Kleider-Offutt's opinion, the government points out that she does not know what was shown on television, and, thus, she is merely speculating that the image of Glass on the news was consistent with the photograph on the line-up. [*Id.* at 3-4.]

The Eleventh Circuit has adopted a two-part analysis to determine whether an out-of-court identification procedure violates due process. First, the Court considers whether the identification procedure was unduly suggestive. *U.S. v. Winfrey*, 403 F. App'x 432, 435 (11th Cir. 2010) (citing *United States v. Diaz*, 248 F.3d 1056 (11th Cir. 2001)). If the Court concludes that the identification procedure was not unduly suggestive, then the inquiry ends. If, however, the Court concludes that it was, then the Court considers whether, under the totality of the circumstances, the identification was nevertheless reliable. *Id.* The Supreme Court

has identified factors the Court should consider to determine the reliability of an identification, including: (1) the opportunity the witness had to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Id.* (citing *Neil v. Biggers*, 409 U.S. 188 (1972), and *Diaz*).

"The Constitution does not impose a *per se* rule requiring an evidentiary hearing in every case of a claimed improper identification." *United States v. Mustafa*, No. 1:11-CR-234-01-CAP-AJB, 2012 WL 1904595, at *5 (N.D. Ga. Apr. 12, 2012), *report and recommendation adopted*, 2012 WL 1903255 (N.D. Ga. May 25, 2012). This is especially true where, as here, there is no credible allegation of any "improper state conduct" that may have tainted M.G.'s identification. *See Perry v. New Hampshire*, 565 U.S. 228, 245 (2012) ("The fallibility of eyewitness evidence does not, without the taint of improper state conduct, warrant a due process rule requiring a trial court to screen such evidence for reliability before allowing the jury to assess its creditworthiness."). As the Supreme Court has explained:

> Our decisions . . . turn on the presence of state action and aim to deter police from rigging identification procedures, for example, at a lineup, showup, or

28

> photograph array.  When no improper law enforcement
> activity is involved, we hold, it suffices to test reliability
> through the rights and opportunities generally designed
> for that purpose, notably, the presence of counsel at
> postindictment lineups, vigorous cross-examination,
> protective rules of evidence, and jury instructions on both
> the fallibility of eyewitness identification and the
> requirement that guilt be proved beyond a reasonable
> doubt.

*Id*. at 232-33.  The "potential unreliability" of eyewitness evidence does not alone

render the introduction of such evidence at trial fundamentally unfair, much less

require an evidence hearing.

Here, Glass's contention that M.G.'s viewing of Glass's photograph on the

news primed her to select Glass out of the photo array is based on nothing more

than the *ipse dixit* assertion of Dr. Kleider-Offutt.  The government correctly points

out that Dr. Kleider-Offutt apparently does not know what photograph M.G. saw

on the news, and thus, any opinion about whether that photograph unduly primed

M.G. to identify Glass's photograph in law enforcement's photo array would be

pure speculation.  Moreover, Glass points to no competent evidence that suggests

that the officers who conducted the photo array created suggestive circumstances

that may have undermined the unreliability of M.G.'s identification.  On this

record, Glass cannot carry his burden to show that the identification technique used

by law enforcement was unduly suggestive, and, thus, his motion should be denied.

As Glass has not met his burden to show that the out-of-court identification was suggestive, there is no need to examine the second factor of the due process analysis, *i.e.* whether the identification was nonetheless reliable. *See Mustafa*, 2012 WL 1904595, at *6 ("[B]y making a finding that the photo displays and procedures used were not impermissibly suggestive, the undersigned need not examine the second part of the due process analysis.").

Accordingly, it is **RECOMMENDED** that Glass's Preliminary Motion to Suppress Out of Court Identification and Evidence of a Suggestive Photo Array [Doc. 1180] be **DENIED**.

## VII.   CONCLUSION

For the foregoing reasons:

It is **ORDERED** that Defendant's Motion to Compel Discovery [Doc. 739] and Defendant's Motion for Full Identification of Government Undercover Agents/Informants [Doc. 987] are **DENIED**;

It is **RECOMMENDED** that Defendant's Motion to Suppress [Doc. 985] and Defendant's Preliminary Motion to Suppress Out of Court Identification and Evidence of a Suggestive Photo Array [Doc. 1180] be **DENIED**.

The Court **DEEMS WITHDRAWN** Glass's Preliminary Motion to Suppress Evidence Seized from 1991 Chevrolet Caprice [Doc. 986] and

Supplemental Motion to Suppress Evidence Seized from 1991 Chevrolet Caprice

[Doc. 1151].

IT IS SO ORDERED and RECOMMENDED this 23rd day of January, 2018.

_____
JOHN K. LARKINS III
United States Magistrate Judge

31